Filed 6/30/22  P. v. Castillo CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JESUS ANGEL CASTILLO,<br><br>    Defendant and Appellant. | F081679<br><br>(Super. Ct. No. VCF255016A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tulare County.  Gary L. Paden, Judge.

Hilda Scheib, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Robert C. Nash, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

After being convicted of several crimes related to an ATM robbery during which he shot the victim, defendant Jesus Angel Castillo challenges on appeal the sentencing

**SEE CONCURRING OPINION**

court's decision not to strike any of his firearm enhancements pursuant to Senate Bill No. 620 (2017–2018 Reg. Sess.) (Senate Bill 620). We grant the Attorney General's request to take judicial notice of the record in a prior appeal in this matter (case No. F069262) and find no error on this front.

In supplemental briefing, defendant contends, and the Attorney General agrees, that the gang enhancements imposed on defendant must be reversed under Assembly Bill No. 333 (2021–2022 Reg. Sess.). We accept that concession, remand for possible retrial and for resentencing, and otherwise affirm the judgment.

## BACKGROUND

### *Charges*

In an information filed in December 2011, defendant and codefendants Roberto Estrada, Jr., and Miguel Quintero were charged with several Penal Code violations (undesignated statutory references are to the Penal Code): attempted murder (§§ 664, 187, subd. (a); count 1); carjacking (§ 215, subd. (a); count 2); first degree robbery (§§ 211, 212.5, subd. (b) [ATM robbery]; count 3); assault with a firearm (§ 245, subd. (a)(2); count 4); assault with a deadly weapon (i.e., knife) (§ 245, subd. (a)(1); count 5). The information also contained several special allegations as to defendant: that counts 1 through 4 were violent felonies subject to the gang enhancement found in section 186.22, subdivision (b)(1)(C); that count 2 is subject to section 186.22, subdivision (b)(4); that count 5 was subject to the gang enhancement found in section 186.22, subdivision (b)(1)(A); that defendant personally caused great bodily injury with respect to all five counts (§ 12022.7, subd. (a)); that defendant personally used a firearm in the commission of each of the five counts (§ 12022.5, subd. (a)); that defendant's firearm use caused great bodily injury as to counts 1 through 3 (§ 12022.53, subd. (d)); and that a principal personally and intentionally discharged a firearm causing great bodily injury as to counts 1 through 3 (§ 12022.53, subds. (d), (e)(1).)

2.

*Jury Verdicts*

On December 18, 2013, the jury convicted defendant on all five counts. The jury found defendant committed count 1 (attempted murder) willfully, deliberately and with premeditation (§ 664, subd. (a)); for the benefit of, at the direction of or in association with a criminal street gang (§ 186.22, subd. (b)); during which he personally and intentionally discharged a firearm (§ 12022.53, subds. (b), (c)) proximately causing great bodily injury to a nonaccomplice (*id.*, subd. (d), § 12022.7, subd. (a)). The jury found that in the commission of count 2 (carjacking), defendant personally and intentionally discharged a firearm (§ 12022.53, subds. (b)–(c)) proximately causing great bodily injury to a nonaccomplice (*id.*, subd. (d), § 12022.7, subd. (a)); and that defendant committed count 2 for the benefit of, at the direction of, or in association with a criminal street gang (§ 186.22, subd. (b).) The jury found that defendant committed count 3 (robbery) for the benefit of, at the direction of, or in association with a criminal street gang (*ibid.*) while the person robbed was using or had just used an ATM and was still near the machine; and that he personally and intentionally discharged a firearm (§ 12022.53, subds. (b)–(c)) proximately causing great bodily injury to a nonaccomplice (*id.*, subd. (d)), § 12022.7, subd. (a).) The jury found defendant committed count 4 (assault with a firearm) for the benefit of, at the direction of, or in association with a criminal street gang (§ 186.22, subd. (b)) and personally used a firearm (§ 12022.53, subd. (a)) and personally inflicted great bodily injury (§ 12022.7, subd. (a).) Finally, the jury found that defendant committed count 5 (assault with a deadly weapon) for the benefit of, at the direction of, or in association with a criminal street gang (§ 186.22, subd. (b)) and that in the commission of count 5, defendant personally used a firearm (§ 12022.5, subd. (a)) and personally inflicted great bodily injury (§ 12022.7, subd. (a)).

*Castillo I*

Defendant appealed the judgment. In December 2016, we issued our unpublished opinion in *People v. Castillo* (Dec. 15, 2016, F069262) (*Castillo I*). In that opinion, we

reversed the finding of premeditation as to the attempted murder and concluded that the sentence on defendant's robbery conviction must be stayed under section 654. We remanded for resentencing and otherwise affirmed the judgment.

*Remand After Castillo I*

On remand, the court resentenced defendant as follows: midterm of four years on count 3, plus 10 years for the gang enhancement (§ 186.22, subd. (b)(1)(C)), plus 25 years to life for the gun enhancement (§ 12022.53, subd. (d)); 15 years to life on count 2 (see § 186.22, subd. (b)(4)), plus 25 years to life for the gun enhancement (§ 12022.53, subd. (d)), consecutive to count 3; midterm of seven years on count 1, plus a consecutive 10 years for the gang enhancement (§ 186.22, subd. (b)(1)(C)), plus a consecutive 25 years to life for the gun enhancement (§ 12022.53, subd. (d)), all stayed pursuant to section 654; midterm of three years on count 4, plus a consecutive 10 years for the gang enhancement (§ 186.22, subd. (b)(1)(C)) all concurrent to count 3 and stayed pursuant to section 654; midterm of three years on count 5, plus a consecutive 10 years for the gang enhancement (§ 186.22, subd. (b)(1)(C)), all concurrent to count 3 and stayed pursuant to section 654. The court also imposed various fines and fees, including a $10,000 restitution fine and a parole revocation restitution fine of $10,000.

*Castillo II*

Defendant again appealed. In April 2020, we issued our unpublished opinion in *People v. Castillo* (Apr. 27, 2020, F076422) (*Castillo II*) in which we remanded for resentencing for the trial court to: (1) consider how it would like to exercise the discretion granted by Senate Bill 620; (2) stay execution of sentence on count 3 pursuant to section 654; and (3) impose restitution and parole revocation restitution fines in the amount of $2,000 each.

## FACTUAL SUMMARY FROM *CASTILLO II*

At around 5:00 a.m. on July 12, 2011, Jeffrey Gould drove his mother's car to a Bank of Sierra ATM on Visalia Road in Exeter. He parked next to the ATM. While on

4.

the phone with his mother, he walked up and withdrew $700. His mother then called again and told him to withdraw another $220. The ATM indicated there were insufficient funds to withdraw the additional $220. When the ATM dispensed his receipt, it fell to the ground. While Gould retrieved the receipt, he noticed an older man behind him. Gould let the man use the ATM and walked back to his car, still talking to his mother. After the man finished using the ATM, Gould again tried to withdraw more money and was again notified he had insufficient funds. The receipt for this transaction also fell to the ground, and Gould picked it up.

That is when defendant and another person "ran up" to him. Other evidence eventually showed that the second person was Roberto Estrada, Jr.

Estrada was holding a knife and told Gould, "'Give me your shit, Holmes.'" Gould responded, "'F[**]k you.'" Estrada then hit Gould. Estrada and Gould "scuffled around." Defendant then shot Gould and said, "'Do the f[**]k I told you, punk.'" Defendant and Estrada picked up Gould's money off the ground and left in his car.

An ATM camera captured much of the incident, and the footage was admitted at trial. Gould testified everything was accurate on the video.

Gould was hospitalized for over two weeks. The bullet broke two of Gould's ribs and "took" a lower piece of his left lung. Gould also had his spleen removed. The bullet began causing an abscess requiring surgery to remove it.

Gould thought the two men were Sureño gang members because one of them was wearing "a blue-white jersey." Additionally, Gould believed the word "Holmes" was "gangster slang."

***Raul Pablo's Testimony***

Gardener Raul Pablo began working near the Save Mart on Visalia Road in Exeter at around 5:00 a.m. on July 12, 2011. After Pablo began working, a dark-colored Blazer came behind his trailer. Pablo watched the Blazer because he was concerned something would be stolen from him. He saw two young Hispanic men exit the Blazer. Pablo

thought the two men were going to get money from the bank nearby. Then Pablo heard a gunshot.

The two men took a white car in the parking lot. The Blazer also left when Pablo heard the gunshot. Pablo approached the ATM and saw a young man who had been shot.

### *Officer Ashley Salinas's Testimony*

Officer Ashley Salinas with the City of Exeter received a call at about 5:15 a.m. that day. Salinas responded to the Bank of Sierra and observed a bloody man sitting on the ground in front of the bank. The victim told Salinas he had been shot. He had difficulty communicating with Salinas, was sweating, and appeared to be in shock. He told Salinas the suspects had shot him, robbed him, and had taken his car. Salinas informed dispatch that the victim's vehicle was a white Mazda.

Officer Salinas also examined a nine-millimeter Luger shell casing recovered at the scene.

### *Officer Stephen Mota's Testimony*

Officer Stephen Mota was dispatched a couple blocks north of Bank of Sierra pursuant to a report that the victim's vehicle had been found there. When Mota arrived, he observed that the vehicle was still running.

### *Officer Daniel Green's Testimony*

Officer Daniel Green, then a detective, was the primary investigator of the July 12, 2011, shooting. He was called out to the scene around 5:45 a.m. on July 12, where he reviewed surveillance footage from the ATM.

Later that afternoon, Detective Green "went by" a home on West Willow in Exeter and observed a black Chevy Trailblazer in the driveway. The next day, Green executed a search warrant at the residence. In one of the rooms, Green found a handgun with its slide open. He also found a loaded magazine, a nine-millimeter Luger bullet outside the magazine, and a cleaning agent. A jersey with blue writing and a baseball cap were also found in the home.

6.

Farmersville police detective Tony Mosqueda conducted surveillance on the West Willow home on the night of July 13, 2011. At about 10:00 or 10:30 p.m., Mosqueda observed a gold Plymouth van and a red Chevy Silverado truck leave the residence. Mosqueda requested that another officer conduct a traffic stop of the vehicles. The other officer activated his overhead emergency lights. The red truck then passed the van and "sped off." Defendant later admitted to running from the police in the truck.

### Defendant's Interrogation

Hours later, Detective Mosqueda interrogated defendant and took photographs of his tattoos. Defendant had the letters "H" and "G" tattooed on his abdomen.

Defendant's interrogation was played for the jury. Defendant admitted he had been in the Silverado and ran from police. Defendant said he ran because of "what I'm on"—meaning methamphetamine. He had used methamphetamine a couple of hours before the interrogation.

Defendant had been staying with his cousin in the house on Willow for the past two weeks. Before that, defendant had been in Hawaiian Gardens. When asked if he belongs to a gang, defendant responded, "Well I hang around with them.…" Detective Green followed up, asking directly, "Are you part of a gang?" Defendant replied, "Skip that [question]."

After defendant was told that police had video of the incident, defendant admitted he had "something to do with it." Defendant had been with his cousin Miguel, Miguel's "girl" Liz, and Robert ("Fool"). Defendant and Estrada were sitting in the back seat of the Trailblazer when defendant saw a "twenty-something male" using an ATM. Defendant and his "buddy" hopped out of the car and saw "the cash." Defendant told the man, "Shoot me the money." The man threw the cash at defendant and Estrada.

Defendant admitted he had a gun, but initially said he did not know who shot the victim. Later, defendant said he shot the victim because "I thought if, you know, he was coming towards me I was the one who was going to end up being shot.… He's way

7.

bigger than me, man." Defendant thought the gun he had was a nine-millimeter. After the incident, he gave the gun to his cousin, Miguel.

After grabbing the money, defendant and Estrada "jumped in" a car near the victim. Defendant drove the car away. Defendant and Estrada got out of the car by a stop sign. The vehicle they had arrived in at the ATM "was parked right there like waiting to see if … something were [*sic*] wrong.…" Defendant and Estrada ran to the vehicle, got in, and went home.

### Lizette Diaz's Trial Testimony

Lizette Diaz (Diaz) did not want to testify. She is the mother of Miguel Quintero's child. Diaz knew defendant as Miguel Quintero's cousin. When asked if she had heard of someone named "Bones," Diaz testified she had seen Bones once. Other evidence indicates that "Bones" was in fact Roberto Estrada, Jr.

One time, Quintero drove Diaz, defendant, and Bones to a fast-food restaurant in Visalia. The four then went to Diaz's house. After about an hour, they left, intending to go to Quintero's house. Quintero pulled into a shopping center between a pizza place and a bank. Defendant and Bones got out of the vehicle. Quintero and Diaz drove away. Quintero decided to pull over near a stop sign. Quintero and Diaz sat and talked about defendant. Quintero again began driving away when they saw defendant and Bones. Both men got in the car, and Diaz did not remember whether they said anything as they entered.

### Lizette Diaz's Pretrial Interview

Detective Green interviewed Diaz in September 2011. Green had tried to interview her earlier, but she would not return his phone calls.

Detective Green began by telling Diaz that she was not under arrest and was free to go at any time. Diaz told Green that she, Quintero, defendant, and Bones went to a fast-food restaurant, then to her house. Diaz told Green that defendant or Bones told them to pull over into a parking lot. Bones and defendant got out of the vehicle, and

Quintero and Diaz left. Quintero then stopped on the side of a road. After they had been stopped "for some time," a white vehicle pulled up in front of them. Defendant was driving and Bones was with him. Defendant and Bones then got into the vehicle Quintero was driving.

*Gang Testimony*

### Kasey Woodruff

Kasey Woodruff from the Los Angeles County Sheriff's Department testified that she interviewed defendant in July 2011 for this case. Defendant told her that he had recently been "jumped in" as a member of the Varrio Hawaiian Gardens. Defendant told her he goes by the moniker of "Chewy." He also showed her a Hawaiian Gardens tattoo on his chest and an "H" and a "G" on his face.

### Esteban Soliz

Detective Esteban Soliz is a member of the Los Angeles County Sheriff's Department gang unit. Soliz testified that "Hawaiian Gardens" or "Varrio Hawaiian Gardens" is an "Hispanic gang," which controls the city of Hawaiian Gardens in southeast Los Angeles County.

Detective Soliz has investigated 200 to 300 cases in which Varrio Hawaiian Gardens gang members were suspects. Hawaiian Gardens is the only Hispanic gang in the city, but they also commit crimes outside the city. The Hawaiian Gardens gang claims the number 13 and the "G" from the Green Bay Packers insignia.

### Previous Hawaiian Gardens Offenses

In June 2005, Deputy Jerry Ortiz was killed by a Hawaiian Gardens gang member.

A detective from Exeter contacted Detective Soliz regarding gang tagging that occurred in June 2011. Soliz opined that the graffiti was tagged by a gang member who claims or associates with Hawaiian Gardens. Based on what Soliz read, three Hispanic

9.

males were tagging graffiti in an alleyway when they were confronted by a witness. The taggers "pulled" handguns and "a shooting occurred."

Detective Soliz testified that on December 17, 2009, three Hawaiian Gardens gang members approached a female, pulled out a knife, and told the victim to give them all her money and her phone. The victim decided to surrender the items. The three perpetrators ran from the scene and yelled, "Varrio Hawaiian Gardens." All three perpetrators were convicted.

Detective Soliz was asked to identify the primary activities of the Hawaiian Gardens gang. Soliz responded, "The crime of activity [*sic*] ranges anything from minor assault with their hands and feet, they can go all the way up to assaults with weapons, whether it be bats, pipes, guns, knives, which would escalate to attempt[ed] murder. [¶] They are good for being convicted of murders, extortions, witness intimidations, vehicle thefts, robberies, burglaries, attempt[ed] robberies, attempt[ed] burglaries. Anything you can think of that's felonious or vicious."

**Gang Testimony Concerning Defendant**

Detective Soliz researched Estrada's and defendant's gang background. Soliz has spoken to other officers about them and read police reports and field identification cards concerning them. Soliz has personally spoken with defendant, but not with Estrada. Detective Soliz described defendant's tattoos depicted in several photographic exhibits. Exhibits 19, 20 and 21 show tattoos on defendant's face depicting an "H" and a "G" for Hawaiian Gardens. Exhibits 22 and 23 show tattoos which, together, depict the number 13, which represents a Hispanic gang in the southeast area. A tattoo of three dots was also depicted. Soliz seemed to indicate that while such a tattoo could be a gang-related reference to "my crazy life," such a tattoo alone does not conclusively indicate gang membership. Exhibit 23 also showed tattoos across defendant's left four fingers reading "BHGR" which stands for Barrio Hawaiian Gardens Rifa, which represents his gang.

10.

Exhibit 24 depicts an "HG" tattoo across defendant's abdomen, which represented Hawaiian Gardens. Exhibit 26 depicts a tattoo showing defendant is representing a criminal street gang from the southeast Los Angeles area.

Exhibit 27 depicts defendant's belt buckle which says "LA." Detective Soliz explained that "they"—presumably gang members—"use a lot of sports memorabilia." Soliz said that Los Angeles Dodgers clothing is popular with Sureño gangs. Soliz opined that based on the totality of the circumstances—including defendant's gang tattoos—the blue "LA" belt buckle was gang-related clothing.

Detective Soliz opined that defendant is a gang member. He meets several criteria for gang membership: gang tattoos, self-admission of gang membership and being arrested with another gang member.

**Gang Testimony Concerning Estrada**

Detective Soliz also testified concerning exhibits depicting Estrada's tattoos. Estrada has a tattoo of red lips on the left side of his neck. Soliz explained that a talented tattoo artist can make a tattoo of lips that, when viewed a certain way, depict the number 13. This way, gang members can hide the fact that they are representing south side gangs. Estrada also has an "HG" tattoo on his abdomen, representing Hawaiian Gardens. On his upper back, Estrada has a tattoo reading "SELA" which stands for southeast Los Angeles, representing Hispanic gang membership. Across his back, Estrada has a tattoo reading "Hawaiian Gardens" demonstrating he is proud of his gang. Underneath that tattoo, Estrada has a tattoo of "the Hawaiian Gardens punch character." The character is wearing a crown with the Green Bay Packers' insignia, representing "the Gardens."

Detective Soliz opined that Estrada is a gang member. Estrada has gang tattoos, has admitted gang membership, and has gang clothing.

**Gang Testimony Concerning Present Offenses**

The prosecutor presented Detective Soliz a hypothetical based on the facts of this case. Soliz testified such a crime would promote and benefit the Varrio Hawaiian Gardens gang. The fact that two gang members committed the crime displays that the gang is more of a threat to the area than if just one gang member had committed the crime. Additionally, Exeter is controlled by north side gangs, yet the perpetrators were south side gang members. By committing the crime in a rival gang's area, the south side gang members are showing they are not afraid of their rivals.

The perpetrators did not need to wear Hawaiian Gardens clothing to enhance the gang because "word of mouth will get down to their … neighborhood." Others will hear that these gang members committed a robbery in rival gang territory, which will enhance the perpetrators' status within the gang.

Detective Soliz testified that gang "tagging" or graffiti shows control; it shows that the gang is in the area. If the tagging is done in a rival gang's area, it shows that they do not fear the rival gang.

**Defense Gang Expert's Testimony**

Martin Sanchez-Jankowski (Sanchez-Jankowski) testified as the defense's gang expert. Sanchez-Jankowski is a professor of sociology for the University of California. He had an opportunity to read through reports, look at "a video," and become familiar with the circumstances of the case.

Sanchez-Jankowski said that in order to determine whether a crime was committed for the benefit of, at the direction of, or in association with a criminal street gang, he considers several facts. First, he looks to whether the central leadership of a gang had decided on a particular operation, had designated particular agents of the gang to execute it, and how the operation sustained or inhibited the gang. He would also consider whether the crime was committed spontaneously, and how the crime functionally benefitted the gang.

12.

Sanchez-Jankowski testified that gang-directed crimes are usually committed in the early evening or early morning. Crimes committed in the morning hours between 5:00 a.m. and 8:00 a.m. are "usually … individual level crime[s] rather than … organizational crime[s]."

Sanchez-Jankowski was presented with a hypothetical tracking the facts of the present case and asked whether he would consider such a crime to have been committed at the direction of, for the benefit of, or in association with a criminal street gang. He opined that, in his judgment, such a crime would not have been committed at the direction of, for the benefit of, or in association with a criminal street gang. Sanchez-Jankowski said that if it were an "organizational crime," the knife and gun would have been used quickly after they were brandished.

Sanchez-Jankowski further testified that when gang members are executing directives of the gang, "the idea is that you don't take drugs because that inhibits your ability to think clearly and to act as necessary.…" Drug usage increases the chance something will go wrong, which causes the entire gang to suffer to some degree.

Sanchez-Jankowski also testified that it is unusual for gang members to take a car during an organizational crime, because such crimes are "all planned out." He also said it was unusual to bring a female to commit a crime like this.

## DISCUSSION

### I. Defendant Has Not Established the Trial Court Misunderstood Its Discretion

On remand from *Castillo II*, the trial court held a hearing. The court stated:

"And the Court is to exercise its discretion to consider striking the gun enhancements pursuant to … Section 12022.53 as a result of Senate Bill [] 620. The Court does not in attend [*sic*]—understands it has the discretion. The Court does not intend to strike those."

Defendant argues the sentencing court misunderstood its discretion at resentencing to impose a lesser enhancement under section 12022.53. Defendant contends the court's

13.

statement, "the Court does not intend to strike those," indicates the court did not consider the option of imposing a lesser firearm enhancement. We disagree.

"'Defendants are entitled to "sentencing decisions made in the exercise of the 'informed discretion' of the sentencing court," and a court that is unaware of its discretionary authority cannot exercise its informed discretion.'" (*People v. Lee* (2017) 16 Cal.App.5th 861, 867.) When a defendant claims the sentencing court was unaware of its discretion, the defendant retains the burden of affirmatively establishing error. (*Ibid.*) Here, the record does not affirmatively establish error.

In this case, the jury found true *all three* firearm enhancements (i.e., § 12022.53, subds. (b), (c), & (d)) as to counts 1, 2, and 3. Under Senate Bill 620, the court had the discretion to strike or dismiss any combination of these enhancements (or none of them) "in the interest of justice pursuant to section 1385." (§ 12022.53, subd. (h).) For example, the court could have stricken the subdivision (d) enhancements, which would have left the subdivision (c) enhancements in place. Or the court could have stricken all three enhancements. Or, as the court did here, it could decline to strike any of the enhancements. The court's decision on which of the three enhancements to strike—if any—would have necessarily resulted in any nonstricken enhancements under section 12022.53 remaining in effect. The court's statement that it did not intend to strike "those" enhancements is consistent with the court understanding the full scope of its discretion—it could strike any, some, all or none of the enhancements under section 12022.53. The court chose to strike none of the enhancements. We will not disturb that determination.[1]

Defendant's discussion of the split of authority between *People v. Morrison* (2019) 34 Cal.App.5th 217 (*Morrison*) and *People v. Tirado* (2019) 38 Cal.App.5th 637, reversed by *People v. Tirado* (2022) 12 Cal.5th 688, is a red herring. In those cases, the

_____

[1]Because any objection on this ground would have been meritless, we find no deficient representation by counsel.

question was whether, after striking a firearm enhancement pursuant to Senate Bill 620, the court could impose a lesser firearm enhancement *that had not been found true by the jury*. (*Morrison*, *supra*, 34 Cal.App.5th at p. 221; *People v. Tirado*, *supra*, 38 Cal.App.5th at p. 644.) In this case, however, *all three* enhancements under section 12022.53 were found true by the jury. Here, the court did not need to decide whether to *impose* a lesser enhancement that had not been found true by a jury; it only needed to decide whether to *strike* any of the enhancements and, if so, which ones. Its statements are consistent with this understanding of its discretion.

*Morrison* stated the question it sought to resolve, and in so doing explained how it is distinguishable from the present situation:

> "*In a case where the jury had also returned true findings of the lesser enhancements under section 12022.53, subdivisions (b) and (c), the striking of an enhancement under section 12022.53, subdivision (d) would leave intact the remaining findings*, and an enhancement under the greatest of those provisions would be mandatory unless those findings were also stricken in the interests of justice. But what if, as here, enhancements under section 12022.53, subdivisions (b) and (c) were not also alleged? May the court impose one of those lesser enhancements in lieu of the greater enhancement under section 12022.53, subdivision (d) if the court finds it is in the interests of justice to do so?" (*Morrison*, *supra*, 34 Cal.App.5th at p. 222, italics added.)

## II. We Accept the Attorney General's Concessions Regarding Assembly Bill 333's Amendments to Section 186.22 and Senate Bill 81

### A. Assembly Bill 333

Effective January 1, 2022, Assembly Bill 333 "'redefine[d] "pattern of criminal gang activity" to require that the last of the predicate offenses "occurred within three years of the prior offense and within three years of the date the current offense is alleged to have been committed," and that the predicate offenses "were committed on separate occasions or by two or more members, the offenses commonly benefited a criminal street

gang, and the common benefit of the offenses is more than reputational."'" (*People v. Vasquez* (2022) 74 Cal.App.5th 1021, 1032.)

The Attorney General concedes that Assembly Bill 333's changes to section 186.22 are retroactive to defendant's case, and that the gang enhancements must, therefore, be reversed because the evidence used to support certain predicate offenses is now insufficient. We accept the concession and will reverse the gang enhancements. They may be retried on remand. (See *People v. Vasquez*, *supra*, 74 Cal.App.5th at p. 1033.) Defendant shall be resentenced. (See *id.* at p. 1038.)

### B.     Senate Bill No. 81

"In 2021, the Legislature enacted Senate Bill No. 81 (2021–2022 Reg. Sess.) …, which amended section 1385 to specify factors that the trial court must consider when deciding whether to strike enhancements from a defendant's sentence in the interest of justice. (Stats. 2021, ch. 721, § 1.)" (*People v. Sek* (2022) 74 Cal.App.5th 657, 674.) "These requirements 'shall apply to sentencings occurring after the effective date of' Senate Bill No. 81. (Stats. 2021, ch. 721, § 1, enacting § 1385, subd. (c)(7).)" (*Ibid.*)

Defendant argues Senate Bill No. 81 is retroactive to his current sentence. However, since defendant will be resentenced, his contention concerning Senate Bill No. 81 is moot. As the Attorney General notes, "[b]ecause any resentencing in this case will take place after Senate Bill No. 81 became effective on January 1, 2022 … the court must [follow] the new law in any such proceeding." (*People v. Sek*, *supra*, 74 Cal.App.5th at p. 674.)

## III.   Defendant Does Benefit From the Enactment of Section 1109

One argument defendant offers in support of reversal is that the gang enhancements in this case were not bifurcated "as is now required." The Attorney General contends: (1) defendant forfeited any error pertaining to bifurcation of the gang allegations by failing to move for bifurcation at trial; (2) section 1109 is not retroactive;

16.

and (3) assuming section 1109 is retroactive, the failure to bifurcate the gang allegations from the underlying charges was harmless in light of the overwhelming evidence of defendant's guilt on the underlying charges. As we agree with the Attorney General's first and last arguments, we affirm the judgment on the underlying convictions.[2]

In addition to the statutory changes described above, Assembly Bill 333 added section 1109, which reads in full:

> "(a) If requested by the defense, a case in which a gang enhancement is charged under subdivision (b) or (d) of Section 186.22 shall be tried in separate phases as follows:

> "(1) The question of the defendant's guilt of the underlying offense shall be first determined.

> "(2) If the defendant is found guilty of the underlying offense and there is an allegation of an enhancement under subdivision (b) or (d) of Section 186.22, there shall be further proceedings to the trier of fact on the question of the truth of the enhancement. Allegations that the underlying offense was committed for the benefit of, at the direction of, or in association with, a criminal street gang and that the underlying offense was committed with the specific intent to promote, further, or assist in criminal conduct by gang members shall be proved by direct or circumstantial evidence.

> "(b) If a defendant is charged with a violation of subdivision (a) of Section 186.22, this count shall be tried separately from all other counts that do not otherwise require gang evidence as an element of the crime.

---

[2]There is a split of authority on the retroactive application of section 1109. For example, in *People v. Burgos* (2022) 77 Cal.App.5th 550, a divided panel of the Sixth Appellate District held the statute applies retroactively to nonfinal judgments. (*Id*. at pp. 564–568.) In *People v. Ramos* (2022) 77 Cal.App.5th 1116, this district reached the same conclusion. (*Id*. at p. 1119.) Division Three of the Second Appellate District took an opposing view in *People v. Perez* (2022) 78 Cal.App.5th 192, holding "that the statute does not apply retroactively to a trial that has already occurred." (*Id*. at p. 207.) Because we conclude any alleged error was forfeited or harmless, we do not revisit the issue of retroactivity in this case. (See, e.g., *People v. E.H.* (2022) 75 Cal.App.5th 467, 480 ["Even if section 1109 applied retroactively to his case—an issue we need not and do not decide here—E.H. cannot show it is 'reasonably probable' he would have obtained a more favorable result if his trial had been bifurcated"].)

This charge may be tried in the same proceeding with an allegation of an enhancement under subdivision (b) or (d) of Section 186.22." (§ 1109.)

The Attorney General contends defendant forfeited the issue of bifurcation of the gang allegations by failing to request bifurcation in the trial court under section 1044. Defendant does not contend he made such a request or that the trial court had a sua sponte obligation to bifurcate the allegations and prejudicially erred by failing to do so. In fact, defendant fails to address this issue at all in his briefs. He simply assumes the enactment of section 1109 somehow entitles him to a reversal of his convictions because bifurcation of "the gang enhancements … from the alleged offenses, as is now required." Defendant cites no authority for his contention, nor does he argue forfeiture principles cannot or should not apply here. Because he did not request bifurcation below and given defendant's undeveloped and conclusory argument in his supplemental brief, we agree with the Attorney General this issue is forfeited on appeal.

Even assuming, arguendo, the trial court may have committed error by failing to bifurcate the gang allegations either at defendant's request or as a sua sponte obligation, any such error would clearly be harmless. In this respect, we first note defendant's supplemental brief does not present a prejudice argument nor argue structural error requires reversal. In any event, defendant's right to bifurcation under section 1109 is purely statutory. (Cf. *People v. Hinton* (2006) 37 Cal.4th 839, 874 [describing right to a separate proceeding under § 190.1 as "merely statutory, not constitutional"].) "There is a strong presumption that any error falls within the trial error category," i.e., is not structural, and thus "subject to harmless error analysis." (*People v. Anzalone* (2013) 56 Cal.4th 545, 554; see, e.g., *People v. Mendoza* (2000) 24 Cal.4th 130, 162 ["Even if a trial court's severance or joinder ruling is correct at the time it was made, a reviewing court must reverse the judgment if the 'defendant shows that joinder actually resulted in "gross unfairness" amounting to a denial of due process'"].) "'Typically, a defendant who has established error under state law must demonstrate there is a reasonable

probability that in the absence of the error he or she would have obtained a more favorable result.'" (*People v. Anzalone*, *supra*, at p. 553; accord, *People v. Lewis* (2021) 11 Cal.5th 952, 973 ["Typically, when an 'error is purely one of state law, the [*People v. Watson* (1956) 46 Cal.2d 818] harmless error test applies'"].)

Here, defendant makes no showing of prejudice and, indeed does not even argue he was prejudiced by the failure of the court to bifurcate the gang allegations from the charged offenses. Nor can we conclude it is reasonably probable defendant would have obtained a more favorable result absent the assumed error. (*People v. Watson*, *supra*, 46 Cal.2d at p. 836.)

The evidence of defendant's guilt was simply overwhelming. Defendant admitted to the shooting, was identified by the victim as the shooter, and the entire incident was captured on surveillance footage. In sum, there was evidence defendant, Roberto Estrada, and Lizette Diaz were passengers in a car driven by Miguel Quintero. They stopped near an ATM and either defendant and/or Estrada asked to be let out. Defendant was armed with a gun and Estrada had a knife. The car drove off and waited nearby. Estrada and defendant approached the victim, Jeffrey Gould, and demanded the money he had withdrawn from the ATM. Gould, although suspecting defendant and the other man were gang members, responded "F[***] you." They scuffled and defendant shot Gould. Defendant and Estrada picked up Gould's money from the ground and took Gould's car. The surveillance video from the bank (which is part of the record on appeal) was played for the jury and matched Gould's description of what happened.

Raul Pablo, a gardener, was working near the Save Mart on Visalia Road in Exeter at around 5:00 a.m. on July 12, 2011. A dark-colored Blazer came behind his trailer. Pablo watched the Blazer because he was concerned something would be stolen from him. He saw two young Hispanic men exit the Blazer. Pablo thought the two men were going to get money from the bank nearby. Then Pablo heard a gunshot. The two men

took a white car in the parking lot. The Blazer also left when Pablo heard the gunshot. Pablo approached the ATM and saw a young man who had been shot.

Law enforcement located defendant, who was detained following a vehicle pursuit. Defendant, in an interview that was recorded and played for the jury, admitted to shooting Gould.

In short, we agree with the Attorney General that defendant's admission he shot Gould, Gould's identification of defendant as the shooter, and the surveillance footage of defendant shooting Gould, is overwhelming evidence of defendant's guilt. For all these reasons, it is not reasonably probable defendant would have received a more favorable result if the gang allegations had been bifurcated. (*People v. Watson*, *supra*, 46 Cal.2d at p. 836.) Therefore, any error was harmless.

## DISPOSITION

All of the gang enhancements (§ 186.22, subd.(b)) imposed on defendant are reversed. They may be retried on remand. In any event, defendant shall be resentenced. In all other respects, the judgment is affirmed.

PEÑA, J.

I CONCUR:

SMITH, J.

20.

POOCHIGIAN, Acting P. J., concurring.

I concur in the judgment and in most of the majority's reasoning. As the majority observes, there is a split of authority as to whether Penal Code section 1109 is retroactive. I wish to express my perspective on the issue, which will surely be one that our courts will continue to be called upon to address.

*Penal Code Section 1109 is Not Retroactive*

No part of the Penal Code is retroactive unless it says so "expressly." (Pen. Code, § 3.) Penal Code section 1109 is part of the Penal Code and does not expressly state that it is retroactive. As a result, Penal Code section 1109 is not retroactive. It really is that simple.

True, in *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*), the Supreme Court "sharply" departed from the clear language of Penal Code section 3. (*People v. Brown* (2012) 54 Cal.4th 314, 324 (*Brown*).) However, it did so in the "specific context" (*ibid.*) of legislative action that "lessen[s] the punishment" for a crime. (*Estrada*, at p. 744.) In that specific context, we are bound to follow *Estrada*'s departure from section 3. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455). But we need not extend it. (See *People v. Cervantes* (2020) 55 Cal.App.5th 927, 939 [Supreme Court has not extended *Estrada* to legislation that does not alter or reduce punishment or treatment for past criminal conduct]; see also *Brown*, at p. 325 [rejecting defendant's contention because it would expand the *Estrada* rule].) Indeed, the Supreme Court itself has cautioned against applying *Estrada*'s interpretation of section 3 "broadly and literally." (*Brown*, at p. 324.) Instead, *Estrada* should play a "limited role" in the "jurisprudence of prospective versus retrospective operation," and " 'should not be interpreted as modifying [the] well-established, legislatively-mandated principle' " embodied in section 3. (*Brown*, at p. 324.)

While we are bound by *Estrada* where it is controlling, we are bound by section 3 in all other circumstances.  (See Code Civ. Proc., § 1858.)

For these reasons, I concur in the judgment.


POOCHIGIAN, Acting P. J.

2.